IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MARYLAND

JANE M. BRENNER                 :
                                :
v.                              :  Civil Action WMN-00-608
                                :
HARTFORD LIFE AND ACCIDENT      :
INSURANCE COMPANY               :

**MEMORANDUM**

Before the Court is Defendant's Motion for Summary Judgment (Paper No. 12).[1] The motion is fully briefed and is ripe for decision. Upon a review of the pleadings and the applicable case law, the Court determines that no hearing is necessary (Local Rule 105.6) and that Defendant's motion will be denied.

I.   **BACKGROUND**

In January 1993, Plaintiff underwent a spinal tap to diagnose the cause of her severe headaches. The spinal tap resulted in various injuries to Plaintiff, including severe myofascial pain with generalized fibromyalgia.[2] See Lawson

---

[1] Also before the Court is Plaintiff's Motion for Hearing on Defendant's Motion for Summary Judgment, or in the Alternative Motion to File an Amended and Supplemental Opposition to Defendant's Motion for Summary Judgment, or in the Alternative Motion to File Surreply, or in the Alternative Motion to Incorporate the Statements and Exhibits Contained Herein into the Plaintiff's Opposition to Defendant's Motion for Summary Judgment (Paper No. 17). The Court will deny Plaintiff's Motion.

[2] Myofascial pain is the pain of, or relating to, the fascia surrounding and separating muscle tissue. Stedman's Medical Dictionary 1173 (27th ed. 2000). Fibromyalgia is a related illness that is a "type of muscular or soft-tissue rheumatism that affects principally muscles and their attachment to bones, but which is also commonly accompanied by fatigue, sleep

1

Report of Feb. 28, 1994 at 1.  Plaintiff suffered from severe low back pain, severe sleep disturbance, persistent headaches, and achy pain involving her neck, shoulders, buttocks, and thighs, see id., and, as a result, was unable to continue working in her present position as a nurse.  On March 19, 1993, Plaintiff applied for long-term disability benefits under her employer's long-term disability policy (the "Policy") which was issued and administered by Defendant.

Under the Policy, to qualify as having a "total disability" during the initial 24 months of coverage, the plan participant must show that she is "prevented by Disability from doing all the material and substantial duties of [her] own occupation."  Policy at 10 (emphasis added).  After the initial 24 months, the plan participant remains "totally disabled" only if she is "prevented by Disability from doing any occupation or work for which [she is] or could become qualified by: (1) training; (2) education; or (3) experience."  Id. (emphasis added).

Based on Plaintiff's inability to perform her own occupation as a nurse, Plaintiff was granted benefits for the initial 24

---

disturbances, lack of concentration, changes in mood or thinking, anxiety and depression."  Lang v. Long-Term Disability Plan of Sponsor Applied Remote Tech., Inc., 125 F.3d 794, 796 (9th Cir. 1997) (citing Fibromyalgia, Arthritis Foundation Pamphlet at 1, 5 (1992)).  Together myofascial pain and fibromyalgia are "characterized by pain, tenderness, and stiffness of joints, capsules, and adjacent structures."  Ellis v. Metropolitan Life Ins. Co., 126 F.3d 228, 231 n1 (4th Cir. 1997) (citing Taber's Cyclopedic Med. Directory (16th ed. 1989)).  For simplicity, the Court will refer to the diseases collectively as "Fibromyalgia."

month period.  See Def.'s Letter to Pl. dated April 28, 1993. After the expiration of the initial 24 month period, Plaintiff's benefits were extended based, primarily, on the periodic reports submitted by Plaintiff's treating physician, Dr. Brian Avin, which indicated that Plaintiff was totally disabled from her own job and any other occupation.  See Feb. 1, 1995 Attending Physicians Statement ("APS"), March 9, 1995 Physical Capabilities Evaluation ("PCE"), Nov. 17, 1995 PCE, Feb. 20, 1996 PCE.  Of the reports submitted by Dr. Avin, only two, the April 25, 1996 APS and the January 9, 1997 APS, indicated that Plaintiff might be capable of sedentary work on a part-time basis at some point in the future.

On September 13, 1996, Defendant arranged for Plaintiff to be examined by Dr. Bruce Kehr, a neuropsychiatrist.[3]  Despite his lack of medical expertise relating to Plaintiff's physical ailments[4] and without the benefit of a physical examination, Dr. Kehr opined that Plaintiff is capable of working "at an occupation where she would be able to, on an 'as needed' basis, get up and walk around, lie down, and alternate sitting with standing."  Kehr Report at 6.  Dr. Kehr indicated that, in his

---

[3] Neuropsychiatry is a specialty field dealing with both organic and psychic disorders of the nervous system.  Stedman's Medical Dictionary 1213 (27th ed. 2000).

[4] Dr. Kehr, in his report, readily admits that "[a]n evaluation of the organic component of [Plaintiff's] back pain is beyond the scope of [his] expertise, and falls in the realm of orthopedic, neurology, and physical medicine."  Kehr Report at 7.

3

opinion, a variety of administrative positions could accommodate Plaintiff, particularly under the Americans with Disabilities Act ("ADA"). Upon receipt of Dr. Kehr's report, Defendant twice sent a copy of the report to Dr. Avin asking for his review and comments. See Def.'s Letters to Avin dated Oct. 11, 1996 and Dec. 11, 1997. Dr. Avin did not respond to either request.

Relying primarily on Dr. Kehr's report, Dr. Avin's implied agreement with that report, and Dr. Avin's own January 1997 APS indicating a Class 4 physical impairment level,[5] Defendant notified Plaintiff that her disability benefits were being terminated due to her failure to meet the "totally disabled" requirement. See Def.'s Letter to Pl. dated Feb. 4, 1997. Plaintiff filed several written appeals of this decision. Each appeal was denied.

Upon notification that her final appeal had been denied, Plaintiff filed suit in the Circuit Court for Baltimore City alleging breach of contract. Defendant responded by having the case removed to this Court on the basis that this Court has exclusive jurisdiction because Plaintiff's Policy is an employee benefit plan within the meaning of the Employment Retirement

---

[5] One part of the APS requires the attending physician to classify the patient as to physical impairment level. A Class 4 impairment level is a "[m]oderate limitation of functional capacity; capable of clerical/administrative (sedentary) activity." On other reports, Dr. Avin had rated Plaintiff as having a Class 5 impairment level, i.e., "[s]evere limitation of functional capacity; incapable of minimal (sedentary) activity."

4

Income Security Act of 1974, as amended, 29 U.S.C. §§ 1001, <u>et seq</u>. ("ERISA"). Defendant then filed a motion for summary judgment. In its motion, Defendant asserts that "its decision to terminate benefits was reasonable" in light of the fact that Plaintiff's fibromyalgia does "not prevent her from working in a position for which she is or could become qualified." Def.'s Mot. at 3. Defendant further asserts that its decision was based on a thorough review of Plaintiff's medical condition and physical limitations, as well as her education, training and experience.

## II. SUMMARY JUDGMENT STANDARD

Pursuant to Fed. R. Civ. P. 56(c), summary judgment is appropriate where "there is no genuine issue as to any material fact and ... the moving party is entitled to a judgment as a matter of law." <u>Anderson v. Liberty Lobby, Inc.</u>, 477 U.S. 242, 248 (1986). The non-moving party is entitled to have all reasonable inferences drawn in its respective favor. <u>Felty v. Graves-Humphreys Co.</u>, 818 F.2d 1126, 1129 (4th Cir. 1987). Only disputes over facts that might affect the outcome of the suit under the governing law will properly preclude the entry of summary judgment. Factual disputes that are irrelevant or unnecessary will not be counted. <u>Anderson</u>, 477 U.S. at 248.

## III. DISCUSSION

### A. Standard of Review

The Fourth Circuit framework for reviewing a denial of disability benefits under a policy covered by ERISA, 29 U.S.C. § 1001, et seq., begins with the de novo determination, by the court, of whether the language of the plan grants the administrator discretion to determine a claimant's eligibility for benefits. See Feder v. The Paul Revere Life Ins. Co., 228 F.3d 518, 522 (4th Cir. 2000). If no discretion is granted, then the Court must review the disability decision de novo. If, however, the language of the plan confers discretion, then the reviewing court will overturn the decision only for an "abuse of discretion" by the claims administrator. See id. (citing Firestone Tire and Rubber Co. v. Bruch, 489 U.S. 101, 111 (1989)). This deferential standard of review requires that a reviewing court not disturb an administrator's decision if it is reasonable, even if the court would have reached a different conclusion.

As an additional safeguard, where a plan grants discretion to an administrator who is "operating under a conflict of interest," that conflict must be weighed as a factor in determining whether there is an abuse of discretion." Elliott v.

---

[6]Plaintiff is asserting a conflict of interest in this instance because Defendant's profit motive conflicts with the fiduciary duty of the administrator to act in the best interest of the plan beneficiary.

Sara Lee Corp., 190 F.3d 601, 605 (4th Cir. 1999) (quoting Bruch, 489 U.S. at 115). This modified standard applies on a case-by-case basis, deviating from the usual abuse of discretion standard only to the extent necessary to counteract any influence unduly resulting from the conflict. Ellis v. Metropolitan Life Ins. Co., 126 F.3d 228, 233 (4th Cir. 1997).

In this case, the Court finds that the Policy gives Defendant, as administrator, discretionary authority to determine eligibility for benefits, including issues of coverage, under the policy. See Policy Art. I (requiring that a plan participant provide "proof of loss satisfactory to the Hartford").[7] Thus, the Court will review Defendant's decision under an abuse of discretion standard and will deny Defendant's motion only if, drawing all inferences in favor of Plaintiff, the Court could conclude that the decision was unreasonable. Additionally, given that Defendant, as both plan administrator and insurer, is

---

[7] While there is no binding precedent in the Fourth Circuit as to whether "satisfactory proof" language is deemed to vest discretionary authority in the administrator, two unpublished opinions indicate that "satisfactory proof" is enough to confer discretion. See Wilcox v. Reliance Standard Life Ins. Co., 1999 WL 170411 at *2 (4th Cir. March 23, 1999) (stating that "[t]hough the Fourth Circuit has not had occasion to construe 'satisfactory to us' language as granting discretion, district courts in this circuit have interpreted 'satisfactory proof' language as conferring on the administrator discretion to grant or deny benefits and sister circuit courts considering identical or similar language have also determined that it conferred discretion") (citations omitted). See also, O'Bryhim v. Reliance Standard Life Ins. Co., 1999 WL 617891 at *5 (4th Cir. Aug. 16, 1999).

7

operating under a conflict of interest, less deference will be given to Defendant's previous decision. See Doe v. Group Hospitalization & Med. Services, 3 F.3d 80, 87 (4th Cir. 1993) (finding that when there is a conflict of interest the administrator's decision "will be entitled to some deference, but this deference will be lessened to the degree necessary to neutralize any untoward influence resulting from the conflict"). Therefore, Defendant's decision will be upheld as reasonable only "if it is the result of a deliberate, principled reasoning process and if it is supported by substantial evidence." Ellis, 126 F.3d at 232 (citations omitted).

### B. Reasonableness of Defendant's Decision

To be entitled to long-term disability benefits under the Policy, Plaintiff must be "prevented by Disability" from working in any occupation. Defendant argues that Plaintiff does not suffer from a disability because fibromyalgia, as a disease, does not qualify as a disability and, even if it did, in this case it would not entitle Plaintiff to benefits because her diagnosis is not based upon objective evidence. See Robinson v. Phoenix Home Life Mutual Ins. Co., 7 F.Supp.2d 623, 633 (D. Md. 1998) (stating that it is within the discretion of the plan administrator to give more weight to objective medical findings than to determinations based on subjective complaints). While the Court agrees that the diagnosis of fibromyalgia often turns on subjective information supplied by the patient, the Court does

8

not agree that this necessarily renders fibromyalgia any less debilitating or that it gives a plan administrator unbridled discretion to deny such claims.

Numerous courts have held that fibromyalgia is a disability. See, e.g., Godfrey v. Bellsouth Telecommunications, Inc., 89 F.3d 755 (11th Cir. 1996); Ellis v. Egghead Software Short-Term and Long-Term Disability Plans, 64 F.Supp.2d 986 (E.D. Wash. 1999). Many other cases, in which disability benefits were denied, turned, not on the fact that the claimed disability was fibromyalgia, but on some other issue. See, e.g., Wilcox, 1999 WL 170411 (upholding decision to deny coverage under pre-existing condition exclusion); Wheeler v. Apfel, 224 F.3d 891 (8th Cir. 2000) (finding no disability on basis that, despite alleged pain, plaintiff had not seen treating physician for over two years and that no medical evidence supported claim). In addition, other courts have found that some objective evidence can be found via diagnosis of pain in various pressure points, see, e.g., Russell v. UNUM Life Ins. Co. of Am., 40 F.Supp.2d 747, 751 (D.S.C. 1999), or, alternatively, that lack of objective evidence alone is not enough to deny a claim given the unusual nature of fibromyalgia. See, e.g., Wilcox, 1999 WL 170411 at *3 (not reaching the issue but observing that many other circuits have found the request for objective proof in context of fibromyalgia unreasonable).

This Court agrees with the view that fibromyalgia presents

an unusual diagnostic evaluation. Both objective and subjective evidence may be used to establish a diagnosis of fibromyalgia, with greater deference accorded to the evaluation of the treating physician. Here, an analysis of the record that was before the plan administrator discloses no objective evidence to dispute the conclusion that Plaintiff suffers from fibromyalgia. See Lawson Report dated Feb. 8, 1994; Panagas Report dated July 26, 1993; Ajrawat Report dated April 13, 1993. Notably, Defendant's own examiner, Dr. Kehr, does not dispute this finding. Thus, the Court must review the plan administrator's determination that, despite her suffering from fibromyalgia, Plaintiff was, nonetheless, capable of maintaining employment. Defendant's motion for summary judgment can be granted only if, viewing the evidence in the light most favorable to Plaintiff, the Court could not conclude that the decision to terminate Plaintiff's benefits was unreasonable and unsupported by substantial evidence.

While the record is voluminous,[8] by Defendant's own admission, its decision to terminate Plaintiff's benefits was based primarily on Dr. Kehr's report, Dr. Avin's lack of response

---

[8] Both parties have included numerous exhibits that refer to events occurring after February 1, 1997, the date on which the termination decision was made. As the Court is limited to the record as it existed before Defendant at the time its decision was made, all documents pertaining to events after February 1, 1997, unless they relate back to a time prior to that date, are irrelevant and will not be considered by the Court.

to that report, and Dr. Avin's own January 9, 1997 APR classification of Plaintiff as having a Class 4 physical impairment level.  See Def.'s Letter to Pl. dated Feb. 4, 1997, and Def.'s Letter to Att'y Mathis dated Sept. 18, 1997.  Based on these documents, Defendant concluded that Plaintiff could work on a full-time basis with limited accommodation.  Defendant then identified six occupations which, in Defendant's view, satisfy Plaintiff's physical limitations and comport with her education, training, and experience.[9]  The Court determines, however, that a fact-finder could conclude that this decision was unreasonable for the following reasons.

    First, on September 13, 1996, Dr. Kehr spent approximately one and one-half hours conducting a mental "examination" of Plaintiff.  During this time, Dr. Kehr did not perform any physical examination.  In fact, Dr. Kehr, in his report, acknowledges that "[a]n evaluation of the organic component of [Plaintiff's] back pain is beyond the scope of [his] expertise, and falls in the realm of orthopedics, neurology, and physical medicine."  Kehr Report at 7.  Despite Dr. Kehr's limitations and the brevity of the exam, Dr. Kehr goes on to state that Plaintiff is capable of working "at an occupation where she would be able to, on an 'as needed' basis, get up and walk around, lie down,

---

    [9]These occupations are: Insurance Clerk; Hospital Insurance Representative; Utilization Review Coordinator; Director, Nurses Registry; Nurse Consultant; and Claim Examiner.

and alternate sitting with standing." Id. at 6.  This opinion contradicts every medical report in Plaintiff's file submitted by Dr. Avin, Plaintiff's attending physician, with the exception of Dr. Avin's April 25, 1996 APS, in which Dr. Avin expresses his hope that Plaintiff could begin trial part-time employment in September 1996.  See April 25, 1996 APS.

With Dr. Kehr's report in hand, Defendant then sought "comments" from Dr. Avin.  When none were forthcoming, Defendant found that Dr. Avin, by his silence, agreed with the contents of Dr. Kehr's report.  As further "evidence" of Dr. Avin's agreement, Defendant focuses on one small section of Dr. Avin's January 9, 1997 APS in which he rated Plaintiff as having a Class 4 physical impairment level.  Defendant goes so far as to later assert that "there is no indication that [Dr. Avin] was not ascribing Ms. Brenner's class IV functional impairment in the context of a full work day."  Def.'s Letter to Att'y Mathis dated Sept. 18, 1997.  In so doing, Defendant ignores the remainder of the report in which Dr. Avin specifically states that Plaintiff is now totally disabled for both her job and any other job, and that she is not released for any employment, trial or otherwise.  See Jan. 9, 1997 APS.  Additionally, well in advance of the denial of Plaintiff's final appeal, Defendant was in receipt of a letter from Dr. Avin in which he indicated that the Class 4 rating in the January 9, 1997 APS should have been that of a Class 5 physical impairment level.  See Dr. Avin Letter dated

Feb. 27, 1998. There is, however, no indication that Defendant ever considered this letter. <u>See</u>, <u>e.g.</u>, Def.'s Letter to Att'y Mathis dated Oct. 22, 1999 (indicating the documents considered by Defendant in making its decision which, notably, did not include Dr. Avin's letter).

Viewing the overall content of the January 9, 1997 APS in the light most favorable to Plaintiff, both with and without Dr. Avin's correction of the Class rating, a fact-finder could view the report as stating Plaintiff is not cleared for work in any occupation and that Defendant's contrary interpretation was unreasonable. A determination that Defendant acted unreasonably is made more probable by the fact that, given Dr. Avin's extensive knowledge of Plaintiff and her condition, greater weight should have been placed on his evaluation, not Dr. Kehr's report.[10]

Defendant's reliance on the fact that six positions were identified for which Plaintiff is allegedly qualified could be found to be equally unsupported. There is little doubt that Plaintiff possesses the education, training, and/or experience to fill any of the six positions. That, however, does not alter the fact that physically Plaintiff is unable to exert herself on a

---

[10] Little significance can be attributed to Dr. Avin's unresponsiveness to Defendant's request for comments as the lack of response could as likely be a result of inadvertence or inattention due to other pressing demands in a physician's schedule.

13

daily basis to the extent necessary to satisfactorily function in any occupation.  See Tyndall v. National Ed. Centers, Inc., 31 F.3d 209 (4th Cir. 1994) (holding that an employer is not required to provide unlimited leave as an accommodation under the ADA).

Defendant also places much credence on reports that Plaintiff is able to engage in various types of activities.  See, e.g., April 5, 1994 Claim Report (indicating that Plaintiff is able to perform light housework and that she moved with "no obvious signs of disabilities or strange restrictions to her movements"); Oct. 13, 1995 Avin Report (commenting that Plaintiff had driven to Harpers Ferry for the weekend and spent two days touring).  These reports could be viewed as misleading as they isolate various days and do not evaluate Plaintiff's day-in and day-out abilities, nor do they document the "price" paid by Plaintiff for exerting herself on specific days.  See Pl. Opp. at 12 (stating that if Plaintiff exerts herself on one day she will spend the next several days in bed recovering).  Given the ups and downs of Plaintiff's physical condition, as well as the specific on-going limitations such as not being able to lift or bend and the necessity of having to change positions or lie down on an "as needed" basis, it is hard to imagine that Plaintiff, as of February 1, 1997, was capable of working a regular work day on a consistent, day-in and day-out basis.  See Ellis, 64 F.Supp.2d at 995 (commenting on similar facts that it is hard to imagine

any occupation a person who is "continuously drowsy and fatigued, unable to concentrate, unable to perform the most simple physical tasks, unable to stand, sit, or walk for more than an hour at a time, unable to work [in long stretches], and unable to predict which hours he will be available, if at all," could fill, much less any employer who would be willing to hire him). There is no evidence in the record that Dr. Avin ever released Plaintiff for any type of work and Dr. Kehr is not qualified, given his professional background and the cursory nature of his exam of Plaintiff, to opine that she is physically capable of such a performance on a daily basis.

## IV. CONCLUSION

For the foregoing reasons, Defendant's Motion for Summary Judgment will be denied.[11]  A separate order will issue.

_____
William M. Nickerson
United States District Judge

Dated: February 23, 2001

---

[11] In light of the denial of this motion, the Court will request that the parties submit a joint report within 15 days as to how they believe that this case ought to proceed.